UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| NATIONAL ASSET CONSULTANTS LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:18-cv-01616-JRS-DML |
| | ) | |
| MIDWEST HOLDINGS-INDIANAPOLIS, | ) | |
| LLC, | ) | |
| F.C. TUCKER COMPANY, INC., | ) | |
| SARI MANDRESH, | ) | |
| DAVID HENNESSY, | ) | |
| VICKIE YASER, | ) | |
| | ) | |
| Defendants. | ) | |

**Order on Motions for Summary Judgment and Other Pending Motions**

A quarrel over a contract for the purchase of an Indiana property in 2018 ballooned into an arduous three-year long litigation process spanning state and federal courts and a thick web of claims, crossclaims, and counterclaims. The parties filed cross-motions for summary judgment and partial summary judgment. (*See* ECF Nos. 192, 204, 206, 214.) For the following reasons, all claims are dismissed. The remaining pending motions in this case, (ECF Nos. 189, 233, 234), are also addressed below.

## I.    Background

On January 5, 2018, Jim Bleier listed the property at 7636 River Road in Indianapolis ("Property") for sale at a price of $80,000. (ECF No. 195-17 at 8.) Bleier listed the Property on behalf of Midwest Holdings-Indianapolis, LLC ("Midwest"), whose sole member is Jim Bleier's wife, Katherine. (ECF No. 196-20.)

1

David Hennessy and Vickie Yaser, who are married, were prospective buyers of the Property. They were represented by real estate agent Sari Mandresh, who in turn is affiliated with F.C. Tucker Company, Inc. ("F.C. Tucker"). (F.C. Tucker Answer ¶¶ 8–9, ECF No. 107.)

On January 6, 2018, Mandresh submitted a written offer on behalf of Hennessy and Yaser to buy the Property. (*Id.*) The offer consisted of an eight-page document titled "Purchase Agreement" and a one-page "Addendum" containing the legal description of the Property. (ECF No. 195-17.) Page 8 of the Purchase Agreement has a section captioned "SELLER'S RESPONSE" and lists three boxes that may be checked: "The above offer is Accepted."; "The above offer is Rejected."; and "The above offer is Countered. See Counter Offer. Seller should sign both the Purchase Agreement and the Counter Offer." (*Id.* at 16.)

Mandresh says Bleier called that same day to say that Midwest had accepted Hennessy and Yaser's offer, (*id.* at 3), though Bleier now denies this, (Bleier Aff. ¶ 14, ECF No. 204-1). Bleier later responded on behalf of Midwest with an emailed copy of the Purchase Agreement, in which Bleier signed his name on Page 8, dated the response January 6, 2018, at 4 p.m., and checked the "Countered" box. (ECF No. 195-17 at 3.) No counteroffer accompanied Bleier's email. (*Id.*) Soon, Hennessy, Yaser, and Bleier signed an "Amendment" to the Purchase Agreement, concerning title work, closing, and a waiver of homeowner's insurance. (ECF No. 94-2.)

For two days afterward, Hennessy, Yaser, Mandresh, and Bleier acted in a way consistent with them believing a contract for the sale of the Property had been

formed.  Mandresh congratulated Hennessy and Yaser on their accepted offer.  (Mandresh Dep. Tr. 29:14–30:10, ECF No. 195-18.)  Bleier emailed Mandresh, a representative of Monument Title Insurance Company, and a "Joe Fall" the following: "Dan, See executed purchase agreement for 7636 River RD.  Please advise on survey and closing date.  Buyer requested fast close!  Jim Bleier."  (ECF No. 195-19.)  Mandresh and Bleier continued to communicate via text about the transaction.  On January 7, 2018, they discussed who to write the check out to for the earnest money.  (ECF No. 195-17 at 19–20.)  On January 8, 2018, Mandresh asked Bleier about an "elevation certificate" and asked why the listing website reflected that the Property's status was "withdrawn."  (*Id*. at 20.)  Later that day, Hennessy and Yaser signed another "Amendment" to the Purchase Agreement changing the title company to Meridian Title Company and changing the closing date, though this second amendment does not bear Bleier's signature.  (ECF No. 36-4.)

Sometime in the evening of January 8, 2018, or the morning of January 9, 2018, Mandresh realized that the "Countered" box was checked on the Purchase Agreement rather than the "Accepted" box.  (Mandresh Dep. Tr. 48:3–9, ECF No. 195-18.)  Among other things, Mandresh told her manager at F.C. Tucker about the parties' communications, Bleier's alleged verbal acceptance, and the two purported amendments to the Purchase Agreement.  (*Id*. at 48:13–25, 55:24–56:2.)  Believing the "Countered" box being checked was a "clerical error," the manager directed Mandresh to cross out the "Countered" box, initial the "correction," and check the "Accepted" box.  (*Id*.; ECF No. 204-10 at 4.)  Mandresh made these changes on a photocopy of Page 8 of the

Purchase Agreement, and she appended the altered Page 8 to the end of the original unchanged eight-page Purchase Agreement and the one-page Addendum. (*See* ECF No. 196-1.) Mandresh did not yet ask Bleier why he checked "Countered" rather than "Accepted."

On January 9, 2018, Hennessy and Yaser wired $80,000 to Meridian Title Company, the escrow agent. (Mandresh Dep. Tr. 85:6–9, ECF No. 195-18.) The same afternoon, Bleier learned from an email that the Property could be more lucrative if it was remodeled before sale. (ECF No. 196-2.) He forwarded the email to his business associate Joe Fall ("Fall"), an agent for National Asset Consultants, LLC ("NAC"). (*Id.*; NAC Interrog. ¶ 1, ECF No. 194-8.) The sole member of NAC is Fall's wife, Karlin Fall. (*Id.*) On the evening of January 9, Bleier called Mandresh, asking whether she could convince Hennessy and Yaser to immediately re-sell the Property to Fall for $85,000, with Mandresh's would-be commission paid separately. (Mandresh Dep. Tr. 66:4–11, ECF No. 195-18.) Hennessy and Yaser were not interested. (*Id.* at 152:19–24.)

On January 10, 2018, Mandresh emailed Bleier, "My office noticed that you signed the [Purchase Agreement] as countered. Could you please correct and re-sign?" (Ex. H, ECF No. 195-18.) Bleier responded by sending a purported counteroffer for $145,000. (*Id.*) Within an hour after sending the counteroffer to Mandresh, Bleier pitched the Property to Fall for remodeling. (ECF No. 196-5.)

On January 11, 2018, Mandresh accused Bleier of trying to back out of the purported deal, but Bleier refused to acknowledge that checking "Countered" was a clerical error, instead maintaining that checking "Countered" was his intent all along. (ECF No. 195-17 at 5.)

Hennessy, Yaser, and Mandresh were upset with this turn of events. In text messages to Mandresh, Hennessy pledged to "punish" and "haunt" Bleier. (ECF No. 204-5 at 12, 13.) As Hennessy explained it, "when you make a deal and decide whoa I have a better deal you can be up front or do what [Bleier] [d]id." (*Id*. at 11.)

On January 29, 2018, Hennessy and Yaser, represented by Hennessy, filed a state court complaint against Midwest for specific performance. (ECF No. 196-16.) Hennessy and Yaser attached the altered Purchase Agreement, with the appended "corrected" version of Page 8 that was marked "Accepted" and initialed by Mandresh. (Compl. for Specific Performance ¶ 6, ECF No. 196-16.) The complaint reflects that Bleier had returned a written response indicating the offer was countered, (*id*.), though the complaint otherwise does not explain what the altered version of Page 8 was or meant. The remainder of the complaint details circumstantial evidence that a contract had formed, (*id*. ¶¶ 7–14), facts that are already laid out above.

When they filed their state court lawsuit against Midwest, Hennessy and Yaser did not know that Midwest no longer had title to the Property. (ECF No. 207 at 2–3.) In fact, there were a string of transactions involving the Property that they did not know about. On January 11, 2018, while Midwest's putative counteroffer to Hennessy and Yaser was pending, Midwest, through its agent Bleier, accepted an offer

from NAC, through its agent Fall, for the purchase of the Property for $150,000. (ECF No. 196-6.) Midwest financed NAC's purchase with a purchase-money mortgage. (ECF No. 196-7.) Planning to renovate and flip the Property, NAC engaged GK Services, LLC ("GK Services") on January 15, 2018, to perform remodeling work for a contract price of $129,102. (ECF No. 196-8.) NAC paid the contract price by promissory note. (ECF No. 196-10.) NAC's sole member Karlin Fall apparently also executed a personal guarantee of the contract price, (ECF No. 196-9), though she did not sign it until after this litigation began, (ECF No. 196-11).

On February 27, 2018, Hennessy and Yaser filed a lis pendens notice with the Marion County Clerk. (ECF No. 196-17.) "Lis pendens" means "a pending suit or suit pending." 54 C.J.S. *Lis Pendens* § 1 (2021). "The doctrine of lis pendens operates so as to charge a subsequent purchaser of property and third parties having an interest in property with notice of [legal] actions concerning that property, and any person who subsequently acquires an interest in the property does so subject to the risk of being bound by an adverse judgment in the pending case." *Id.* The lis pendens notice that Hennessy and Yaser filed contained a description of the Property, the parties of the underlying state court action, and a description of the litigation as one "in which Plaintiffs [Hennessy and Yaser] seek the specific performance of a completed purchase agreement obligating Defendant [Midwest] to sell said property to Plaintiffs." (*Id.* at 2.)

According to NAC and Midwest, the lis pendens notice operated as a cloud on title and decimated the Property's value. (*See generally* ECF No. 204-12 at 11–13 (expert

6

witness summary of NAC's and Midwest's alleged pecuniary damages from lis pendens notice after efforts to mitigate damages).)  NAC claims to have become delinquent on its obligations to GK Services and Midwest on the promissory note and mortgage agreement, respectively.  (Fall Aff. ¶ 6, ECF No. 204-2.)  Fall, on behalf of NAC, sought to refinance but failed to find a willing lender.  (*Id*. ¶¶ 7–8.)  Likewise, Bleier's efforts on NAC's behalf to refinance the Property did not bear fruit.  (Bleier Aff. ¶¶ 16–17, ECF No. 204-1.)  According to Bleier, the Property could not be sold through the spring and summer of 2018 because of the lis pendens notice.  (Bleier Aff. ¶ 19, ECF No. 204-1.)  Furthermore, any foreclosure sale would not have generated anything close to the Property's market value.  (ECF No. 204-12 at 11.)  In other words, the lis pendens apparently frustrated the hopes of GK Services, NAC, and Midwest that NAC would resell the Property for profit, as the ultimate sale price was intended to cover both NAC's mortgage loan obligation to Midwest and NAC's promissory note obligation to GK Services.

Eventually, on September 26, 2018, DDML Holdings, LLC ("DDML") offered to purchase the Property for $100,000.  (*Id*.)  NAC sought and obtained GK Services's and Midwest's permission for a short sale.  (Fall Aff. ¶¶ 9–10, ECF No. 204-2.)  Half of the short sale proceeds went to GK Services, and half went to Midwest.  (*Id*. ¶¶ 11, 13.)  Since NAC had previously paid $40,000 of its $150,000 mortgage loan obligation, $110,000 was owing; however, Midwest took the $50,000 from the short sale and wrote off the remaining $60,000 due on the loan.  (*Id*. ¶ 11.)  At the time of the short sale, NAC had paid none of the $140,000 obligation to GK Services; after taking

$50,000 from the short sale, GK Services took an additional $30,000 in cash from NAC and then accepted from NAC a promissory note for the remaining $60,000. (*Id.* ¶ 13.) By NAC and Midwest's calculations, NAC was damaged by the lis pendens notice in the amount of at least $70,000 (the total cash payments to Midwest and Gk Services), and Midwest was damaged in the amount of at least $60,000 (the amount due on its loan to NAC that was written off after the short sale). (*Id.*; Bleier Aff. ¶ 18, ECF No. 204-1.)

Hennessy and Yaser dispute that any of these alleged pecuniary damages are legitimate. The Court will not repeat in whole what Hennessy and Yaser have laid out in their briefs, but they have in essence demonstrated that the four parties to the short sale—NAC, Midwest, GK Services, and DDML—have a significant history of prior business relationships among them. (*See* ECF No. 193 at 10–33.) Emails between agents and attorneys for NAC, Midwest, and GK Services—which the Court ordered to be produced in the course of discovery, (ECF No. 177)—show that even before this federal lawsuit began, those three parties had agreed to a joint legal strategy by which they would focus their energies on recovering damages from Hennessy, Yaser, Mandresh, and F.C. Tucker rather than from one another. (*See generally* ECF No. 196-18.) Based on the emails, Bleier of Midwest seemed to be the one coordinating legal action by all three parties, directing at various points the hiring of attorneys for NAC, (*id.* at 3), the timing of GK Services' filing of its mechanic's lien and foreclosure thereof, (*id.* at 16), and the details of the short sale among the three parties, (*id.* at 20–21). Emotions between the parties have run high. Just as the above-referenced

communications from Hennessy reveal a serious disdain for Bleier, communications from Bleier reveal an equally serious disdain for Hennessy. (*See, e.g.*, *id.* at 78 ("I would like to run up Hennessy's bill by objecting to everything"); ECF No. 195-5 ("Your client [Hennessy] should stop wasting his hard-earned money, at his age, and focus on his drunk driving defense.").) Hennessy and Yaser say all of this adds up to NAC and Midwest orchestrating fraudulent transfers of the Property for the sole purpose of financially injuring Hennessy.

Abiding by the joint legal strategy among the parties to the short sale, NAC invoked diversity jurisdiction and sued Midwest, Hennessy, Yaser, Mandresh, and F.C. Tucker in federal court on May 25, 2018. NAC and Midwest then entered a mutual release of claims against one another, and NAC filed an amended complaint, (ECF No. 88). For all intents and purposes, NAC and Midwest's interests in this litigation are now fully aligned. Against Hennessy and Yaser, NAC brought claims under the Indiana Crime Victims Relief Act, *see* Ind. Code § 34–24–3–1, and for abuse of process, slander of title, and malicious prosecution. Against Mandresh and F.C. Tucker ("Tucker Defendants"), NAC brought claims under the Indiana Crime Victims Relief Act and for slander of title. Midwest brought crossclaims against Hennessy, Yaser, Mandresh, and F.C. Tucker for slander of title and violating the Indiana Crime Victims Relief Act; against Hennessy and Yaser, Midwest also alleges tortious interference with a contractual relationship. Hennessy and Yaser brought a crossclaim against Midwest for breach of contract, and they brought a counterclaim against NAC for abuse of process. All parties now move for summary judgment or partial summary

9

judgment. (ECF Nos. 192, 204, 206, 214.) Several other motions, including a motion for sanctions and motions concerning late-filed evidence, are also pending. (ECF Nos. 189, 233, 234.)

## II.   Evidentiary Rulings

"Admissibility is the threshold question because a court may consider only admissible evidence in assessing a motion for summary judgment." *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) (citations omitted). Before reaching the merits, the Court will first address various evidentiary matters.

### A. *Emails Between NAC, Midwest, and Associated Individuals*

NAC and Midwest object to the admission of emails—described above and laid out in detail in Hennessy and Yaser's brief in support of summary judgment, (ECF No. 193 at 35–41)—that appear to show a coordinated effort between NAC, Midwest, and associated individuals and entities to manipulate the timing and "optics" of consequential damages. NAC and Midwest argue the emails are inadmissible because they are irrelevant and because they fall under the public policy exclusion for evidence of settlement discussions. These objections are without merit.

First, the emails are obviously relevant. Evidence is relevant if "it has any tendency to make a fact more or less probable" and "is of consequence in determining the action." Fed. R. Evid. 401. Hennessy and Yaser have brought a counterclaim against NAC for abuse of process. In Indiana, the two elements of abuse of process are (1) an ulterior purpose or motive and (2) a willful use of process not proper in the regular conduct of the proceedings. *Waterfield v. Waterfield*, 61 N.E.3d 314, 328 (Ind. Ct.

10

App. 2016).  The email correspondence at issue is of consequence to the first element, as it tends to show a nefarious intent to financially harm Hennessy and Yaser.  In support of their theory that the emails are irrelevant, NAC and Midwest cite language that, "[i]f a party's acts are procedurally and substantively proper under the circumstances, then the party's intent is irrelevant." *Watson v. Auto Advisors, Inc.*, 822 N.E.2d 1017, 1029 (Ind. Ct. App. 2005), *trans. denied*.  By this specious logic, at John's murder trial, since John did not intend to kill, the murder weapon is irrelevant and should be ruled inadmissible.  Of course, no one could coherently make that argument.  The emails are indisputably relevant to at least one outstanding claim.

Second, the emails are not excluded under Federal Rule of Evidence 408, which deems inadmissible evidence of "furnishing, promising, or offering . . . a valuable consideration in compromising or attempting to comprise the claim," as well as "conduct or a statement made during compromise negotiations about the claim," when introduced to prove or disprove the validity or amount of the claim.  However, the Court may admit such evidence "for another purpose," Fed. R. Evid. 408(b), including "to show the defendant's . . . intent," *Bankcard Am., Inc. v. Universal Bancard Sys.*, 203 F.3d 477, 484 (7th Cir. 2000).  Initially, the emails here do not all constitute "compromise negotiations" for purposes of Rule 408.  As a whole, the emails treat settlement among NAC, Midwest, and GK Services as a foregone conclusion and discuss chiefly how to manage the timing and appearance of court filings and the short sale.  (*See, e.g.*, ECF No. 196-18 at 4.)  Assuming *arguendo* that the emails do constitute compromise negotiations, the emails are nevertheless not being offered to prove or disprove

11

the validity or amount of the breach-of-contract claim and breach-of-contract counterclaim between NAC and Midwest, which were settled.  Rather, the emails are being offered to prove an element of Hennessy and Yaser's abuse-of-process counterclaim.  The emails are therefore admissible under Federal Rule of Evidence 408(b). *See Wine & Canvas Dev., LLC v. Muylle*, 868 F.3d 534, 540–41 (7th Cir. 2017) (holding that testimony on settlement negotiations was admissible to prove ulterior motive element of defendant's abuse-of-process counterclaim).

The objections are overruled, and the Court will consider the emails.

### B. Notation in ECF No. 195-17

NAC and Midwest object on authentication grounds to the notation "Pended means under contract. Listing Agent enters that with MIBOR" in one of Hennessy and Yaser's summary judgment exhibits.  (*See* ECF No. 195-17 at 28.)  Hennessy and Yaser did not respond, so the objection to the notation is sustained.

### C. Affidavit of Jeannie Sheppard

NAC and Midwest object that the Affidavit of Jeannie Sheppard, (ECF No. 195-15), is inadmissible hearsay to the extent that it presents results from a program called TLOxp, which NAC and Midwest characterize as an out-of-court declarant. TLOxp is a "streamlined, custom, scalable investigative and risk management tool for due diligence, threat assessment, identity authentication, fraud prevention and detection, legislative compliance, and debt recovery.  It is composed of public and proprietary records that allow organizations, such as law enforcement agencies, to locate and research connections between individuals, businesses and assets." *United States*

*v. Bigham*, No. 14-CR-20676, 2015 WL 4162503, at *2 n.4 (E.D. Mich. July 9, 2015) (cleaned up) (citation omitted).  But the output of a program like TLOxp is not hearsay, as a machine is not a declarant.  *United States v. Moon*, 512 F.3d 359, 362 (7th Cir. 2008) (citing *United States v. Washington*, 498 F.3d 225 (4th Cir. 2007)); *see also United States v. Lizarraga-Tirado*, 789 F.3d 1107, 1110 (9th Cir. 2015) (Google Earth output not inadmissible hearsay).  The objection is therefore overruled, and the affidavit is not inadmissible on hearsay grounds.

### D.  Affidavits of Beau Dunfee, Jim Bleier, and Joe Fall

The Tucker Defendants object to the affidavits of Beau Dunfee, Jim Bleier, and Joe Fall on the grounds that they state conclusions of law.  For example, Dunfee opines that the "parties never expressed mutual agreement on the terms of the contract . . . ."  (ECF No. 204-12 at, ¶ 2.)  However, not all of the three affidavits is devoted to stating legal conclusions.  For example, statements discussing how a *lis pendens* notice or liens could impair marketability of the associated property, (*see, e.g.,* ECF No. 204-12 at 11; ECF No. 204-1 at 4, ¶ 16), are not legal conclusions if they are offered to establish the existence of pecuniary damages.  To the extent the affidavits state legal conclusions, such as any opinions about whether a contract formed between Hennessy and Yaser and Midwest, the Court will disregard them.  *See, e.g., Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) ("[E]xpert testimony as to legal conclusions that will determine the outcome of the case is inadmissible.").

The Tucker Defendants further object to the Fall Affidavit as inadmissible because it purportedly contradicts Joe Fall's deposition testimony without explanation. If true, that would be problematic. *See Adelman-Tremblay v. Jewel Cos.*, 859 F.2d 517, 521 (7th Cir. 1988) ("The purpose of summary judgment motions . . . is served by a rule that prevents a party from creating issues of credibility by allowing one of its witnesses to contradict his own prior testimony."). Comparing Fall's testimony in the affidavit and in his deposition, however, the Court finds no clear contradiction. (*Compare* Joe Fall Aff. ¶ 15, ECF No. 204-2 (stating that NAC acted in its "best business interests" with regard to transactions done after Mandresh's alleged forgery), *with* Joe Fall Dep. Tr. 107:15–108:12, ECF No. 195-16 (stating he is "not sure" about the factual basis for NAC's lawsuit against F.C. Tucker), *and id*. at 106:21–25 (stating that, to his understanding, NAC filed suit against F.C. Tucker because Mandresh "forged the documents")). To the extent Joe Fall contradicted himself *within* his deposition, such contradictions go to credibility, not admissibility. Hence, the objection to the Fall Affidavit is overruled.

### E.  *Affidavit of Sari Mandresh*

Next, NAC and Midwest ask the Court to disregard a statement that Mandresh "did not review Hennessy and Yaser's Complaint" in her most recent affidavit. (Mandresh Aff. ¶ 5, ECF No. 214-1.) This statement seems to directly contradict her prior sworn statement that she had "reviewed the Plaintiffs' Complaint," (ECF No. 204-9 at 5), and her deposition testimony confirming that prior sworn statement, (Mandresh Dep. Tr. 81:5–24, ECF No. 195-18). The Court will therefore disregard this

clause in paragraph five of Mandresh's most recent affidavit to the extent it violates the sham affidavit rule. *See, e.g.*, *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 861 (7th Cir. 1985).

### F. Affidavit of Tim West

Finally, Midwest moves the Court to reconsider a previous order, which granted Hennessy and Yaser's motion for leave to file a supplemental designation of evidence for purposes of the cross-motions for summary judgment. (*See* ECF No. 232.) The Court agrees that, given Hennessy and Yaser's earlier opportunity to obtain an affidavit from Tim West and given the unfairness to Midwest of this late evidence, the Court granted Hennessy and Yaser's motion in error. Midwest's motion to reconsider, (ECF No. 233), is therefore **granted**; the previous order, (ECF No. 232), is withdrawn; the Affidavit of Tim West is struck from the summary judgment record; and Midwest's alternative motion to designate its own supplemental evidence in response, (ECF No. 234), is **denied** as moot.

## III.    Cross-Motions for Summary Judgment

### A. Summary Judgment Standard

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of production. *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). That initial burden consists of either "(1) showing that there is an absence of evidence supporting an essential element of the non-moving party's claim; or (2) presenting affirmative evidence that

15

negates an essential element of the non-moving party's claim." *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016) (citing *Modrowski*, 712 F.3d at 1169). If the movant discharges its initial burden, the burden shifts to the non-moving party, who must present evidence sufficient to establish a genuine issue of material fact on all essential elements of his case. *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 702 (7th Cir. 2009). "The ordinary standards for summary judgment remain unchanged on cross-motions for summary judgment: [the Court] construe[s] all facts and inferences arising from them in favor of" the non-movant. *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017) (citation omitted).

### B. *NAC's and Midwest's Claims Under Indiana Crime Victims Relief Act*

NAC and Midwest bring claims and crossclaims against the Tucker Defendants, Hennessy, and Yaser under the Indiana Crime Victims Relief Act ("ICVRA"), an interesting statute that creates a civil cause of action for those who believe they are victims of certain property crimes. As relevant to this case, Indiana Code § 34–24–3–1 permits a person to sue any other person who caused a pecuniary loss through conduct that amounts to counterfeiting, forgery, deception, or fraud as those crimes are defined by Indiana law. "An actual criminal conviction is not required for recovery [under the CVRA]; a claimant merely must prove each element of the underlying crime by a preponderance of the evidence." *Wysocki v. Johnson*, 18 N.E.3d 600, 606 (Ind. 2014) (citation omitted). A successful ICVRA claimant may recover treble damages, costs, and attorney fees. *See* Ind. Code § 34–24–3–1.

16

The document central to NAC's and Midwest's claims is the altered Purchase Agreement. To reiterate, that document contains (1) the original eight-page Purchase Agreement in which Bleier checked "Countered" on Page 8; (2) a one-page Addendum signed by Bleier; and (3) an appended photocopy of Page 8 in which Mandresh scribbled out "Countered," checked "Accepted," and initialed next to the now-checked "Accepted" box. (*See* ECF No. 196-1.) NAC and Midwest say Mandresh's creation of the altered Purchase Agreement constituted counterfeiting, forgery, deception, and fraud. F.C. Tucker is liable by *respondeat superior*, or so the argument goes. Likewise, they say Hennessy and Yaser's use of the altered Purchase Agreement as Exhibit B in their state court complaint for specific performance, (ECF No. 196-16), constituted counterfeiting, forgery, deception, and fraud.

Before delving into any of that, though, the Court must consider two threshold questions. The first is whether Indiana's litigation privilege bars NAC's and Midwest's ICVRA claims, which are premised on a written submission to a state court. Although Hennessy and Yaser urge the Court to apply the privilege here, at least one Indiana court has counseled against applying the privilege where the claim at issue alleges an intentional tort like fraud. *See Est. of Mayer v. Lax, Inc.*, 998 N.E.2d 238, 250 (Ind. Ct. App. 2013) (stating that the litigation privilege in Indiana bars defamation-type claims but would not bar claims alleging "fraud, collusion, or tortious conduct against third parties") (dicta). Another judge in this district court refused to apply Indiana's litigation privilege to bar a fraud counterclaim, after consulting Indiana caselaw. *See Heckler & Koch, Inc. v. German Sport Guns GmbH*, 71 F. Supp. 3d

866, 879–80 (S.D. Ind. 2014) (Barker, J.).  Because the Court likewise sees no reason here "to anticipate or predict that Indiana courts would construct the privilege so expansively," *id.*, and because Hennessy and Yaser offer no good reasons why the privilege should be expanded, the Court finds that the litigation privilege does not bar NAC's and Midwest's ICVRA claims.

Requiring more discussion is the second threshold question: whether NAC and Midwest sustained damages because of the other parties' alleged misconduct.  An ICVRA claim is available only if the underlying crime caused damages.  The statute reads, "If a person . . . suffers a pecuniary loss *as a result of* a violation of [property-related crimes] . . . the person may bring a civil action against the person who caused the loss . . . ."  Ind. Code § 34–24–3–1 (emphasis added).  The plain import of the words "as a result of" is that there must be a but-for causal nexus between the property offense alleged and the pecuniary damages sustained.  *See Burrage v. United States*, 571 U.S. 204, 210–15 (2014) (collecting cases holding that phrases like "results from," "because of," "based on," and "as a result of" refer to but-for causality); *see also Noble Roman's, Inc. v. Hattenhauer Distrib. Co.*, 307 F. Supp. 3d 907, 924 (S.D. Ind. 2018) (ICVRA counterclaim failed because counterclaimant "wholly failed to articulate how it suffered pecuniary loss as a result of" allegedly deceptive statements).

The parties dedicate much of their briefs to disputing the amount and authenticity of the damages the lis pendens notice caused to the Property's value.  Hennessy and Yaser—citing interwoven and preexisting business relationships between NAC, Midwest, and GK Services, as well as extensive correspondence between agents for those

companies—claim there were no damages.  In turn, Midwest and NAC allege that the emails and past business relationships evidence only a joint legal strategy between parties to a short sale who aimed to recover damages from Hennessy and Yaser.  The Court does not doubt that a lis pendens notice can diminish the value of the property that is subject to litigation.  *See, e.g.*, 53 CAL. JUR. 3d *Quieting Title* § 20 ("A lis pen-dens, on its face, constitutes a cloud on the title to the real property to which it re-lates."); *Connecticut v. Doehr*, 501 U.S. 1, 29 (1991) (Rehnquist, C.J., concurring) ("The filing of such notice will have an effect upon the defendant's ability to alienate the property, or to obtain additional security on the basis of title to the property . . . ."); *see generally* 54 C.J.S. *Lis Pendens* § 40 (2021).  Indeed, NAC and Midwest have persuasively laid out the damages they have sustained due to the lis pendens notice filed by Hennessy and Yaser.  (*See* Fall Aff. ¶¶ 5–16, ECF No. 204-2; Bleier Aff. ¶¶ 5–20, ECF No. 204-1; ECF No. 204-12 at 11–13.)

In so doing, they have made clear that the filing and continued existence of the lis pendens notice are what caused their damages.  Bleier testified, "By asserting in the lis pendens notice that they were entitled to the Property, Hennessy and Yaser se-verely restricted marketability of the Property."  (Bleier Aff. ¶ 16, ECF No. 204-1.) Joe Fall stated that he could not refinance the Property because one lender was "un-willing to provide any financing on a property encumbered by a lis pendens," and another was "*unwilling to even consider* an application for refinanc[ing] because of the lis pendens."  (Fall Aff. ¶¶ 6–7, ECF No. 204-2 (emphasis added); *see also* Bleier Aff. ¶ 17, ECF No. 204-1.)  Likewise, Midwest and NAC's expert witness testified, "In

this case, the property was clouded by a lis pendens that would have shown up on a title search. . . . [I]nvestors bidding at a public sheriff sale would not bid on the property knowing that it was encumbered by a lis pendens for specific performance, which if successful could retroactively invalidate the sale from Midwest to NAC." (ECF No. 204-12 at 11.) And, as a case cited often by Midwest and NAC states, the "financial pressure exerted on the property owner" by a lis pendens is "not due to the merits of the suit," but rather the very existence of the lis pendens, which creates a "cloud upon his title." *S. Utsunomiya Enters., Inc. v. Moomuku Country Club*, 866 P.2d 951, 963 (Haw. 1994).

Unfortunately, the damages caused by the existence of the lis pendens are beside the point when the Court is evaluating ICVRA claims. The relevant question here is more narrowly whether *the creation or use of the altered Purchase Agreement*—allegedly constituting counterfeiting, forgery, deception, and fraud—caused pecuniary damages to NAC and Midwest. How was the alteration created? At the hands of Mandresh and at the direction of a supervisor. How was the alteration used? Mandresh reproduced and transmitted the altered document to Hennessy and Yaser, who attached it to their state court complaint as Exhibit B. NAC and Midwest have not argued that the creation itself financially injured them, so their theory appears to be that the eventual use of the altered document in the state court complaint injured them.

But the closest NAC and Midwest come to addressing the but-for causal nexus between the use of the altered Purchase Agreement in the state court complaint and

the diminution in the Property's value is stating, "Hennessy and Yaser used the altered Page 8 to assert in their State Court Complaint that they were entitled to the Property. . . . By making this same assertion in the lis pendens notice arising out of their State Court Complaint, Hennessy and Yaser severely restricted the marketability of the Property."[1]  (ECF No. 205 at 28.)  This explanation does not adequately demonstrate the nexus between the alleged misconduct and damages.  A lis pendens notice must accompany *any* action calling into question title to property.  *See* Ind. Code § 32–30–11–3 (requiring anyone who "commences a suit . . . in any court of Indiana . . . to enforce any . . . interest in any real estate" to file a lis pendens notice with the clerk of the county circuit court).  Attaching or not attaching an exhibit—even an allegedly forged one—to a complaint does not impact the necessity of filing a lis pendens notice as to that complaint.  In other words, Hennessy and Yaser had to file a lis pendens notice—damaging the Property's value—not because the altered Purchase Agreement was attached as an exhibit, but because they filed a complaint for specific performance.  The exhibit was not a requirement to filing the complaint, and an exhibit-less complaint would have still triggered the lis pendens requirement.

Indeed, neither NAC nor Midwest has designated evidence that Hennessy and Yaser's use of the altered Purchase Agreement was essential to bringing the state court action.  On its face, the complaint for specific performance shows otherwise.

---

[1] To be clear, the lis pendens notice does not contain the altered Purchase Agreement.  The notice identifies (1) the Property as "subject to the litigation captioned above in which Plaintiffs seek the specific performance of a completed purchase agreement obligating Defendant to sell said property to Plaintiffs," (2) the case number of the state court action, and (3) the parties—Midwest, Hennessy, and Yaser.  (*See* ECF No. 196-17 at 2.)

Hennessy and Yaser's argument was that Bleier's course of conduct indicated acceptance of a contract for the sale of the Property *despite* his checking "Countered" in the Purchase Agreement, (Compl. for Specific Performance ¶¶ 1–15, ECF No. 196-16); their argument was *not* that Bleier had actually checked "Accepted," (*id*. ¶ 6 (alleging that Bleier's written response "indicated a forthcoming counteroffer")).  No reasonable reader of the state court complaint could find that the altered Purchase Agreement was a but-for cause of commencing the state court action.  Moreover, even if the altered document *had* been essential to bringing the case on the merits, that would not matter if the Court is to credit NAC and Midwest's position throughout this litigation that the *very fact* of a lis pendens notice being filed damaged the Property's value, irrespective of the merits underlying the notice.  For the same reason, NAC and Midwest's appeals to the language in the lis pendens notice—referencing a "completed purchase agreement," (ECF No. 196-17 at 2)—miss the mark.  Even if this phrase is read to incorporate everything in the state court complaint, and even if the altered Purchase Agreement were crucial to the merits, the inclusion or exclusion of that phrase had no bearing on Hennessy and Yaser having to file a lis pendens notice pursuant to Indiana Code § 32–30–11–3.

Finally, there is no evidence that the Marion County Superior Court would at any point have lifted the lis pendens but for the inclusion of the altered Purchase Agreement in the state court complaint.  The Court takes judicial notice of the docket in the pending state court action for specific performance, Case No. 49D05-1801-PL-003746.  To prove a but-for causal nexus between crime and damages under a reliance

22

theory, NAC and Midwest would need some proof that the state court considered the altered Purchase Agreement and materially relied on it in refusing to dismiss the case, which would have lifted the lis pendens.[2]  The docket simply does not reflect that this happened.  Nothing in the docket indicates that the state court at any point relied on the altered Purchase Agreement to prevent dismissal of Hennessy and Yaser's lawsuit.  In fact, fatal to the ICVRA claims, the state court has not ruled substantively in the matter *at all*.  No dispositive motions have been filed by either party with the state court in the three years since that litigation began.  The only motion of any substance on the docket is Hennessy and Yaser's motion for a preliminary injunction, filed on January 30, 2018; even that was not briefed and never made it to a hearing, much less a decision.  Obviously, a court that has never been asked to rule substantively has never had an opportunity to rely on any piece of evidence.[3]

In short, the evidence shows only that the existence of the lis pendens notice caused damages—not that the making or use of the altered Purchase Agreement caused damages.  NAC and Midwest have not sustained their burden of proof as to the causal nexus between alleged misconduct and pecuniary damages necessary to

---

[2] In Indiana, if a court renders judgment against the party who filed a lis pendens notice as to a disputed property, the court must direct the clerk to record satisfaction of the lien, right, or interest in the lis pendens record.  *See* Ind. Code § 32–30–11–7.  In other words, a notice of lis pendens will ordinarily be released whenever a court enters judgment in the underlying case.  *See* 54 C.J.S. *Lis Pendens* § 30 (2021).

[3] Furthermore, even if the state court had had an opportunity to rely on the altered Purchase Agreement, the Court doubts that the respected judges of the Marion County Superior Court *would* materially rely on such an ambiguous document in deciding the case.

bring a claim under Indiana Code § 34–24–3–1.  Accordingly, Hennessy, Yaser, Man-dresh, and F.C. Tucker are entitled to judgment as a matter of law on the ICVRA claims.

### C.  Breach of Contract

Hennessy and Yaser and Midwest each move for summary judgment on Hennessy and Yaser's crossclaim for breach of contract.  To prove their claim, Hennessy and Yaser must demonstrate (1) the existence of a contract with Midwest, (2) Midwest's breach of the contract, and (3) damages.  *See, e.g.*, *Old Nat'l Bank v. Kelly*, 31 N.E.3d 522, 531 (Ind. App. 2015).  The chief dispute between the parties concerns the first element—whether an enforceable contract even existed between Hennessy and Yaser and Midwest.  In general, a contract forms only if there is an offer, an acceptance, and consideration.  *Ind. Dep't of State Revenue v. Belterra Resort Ind., LLC*, 935 N.E.2d 174, 179 (Ind. 2010), *modified on reh'g*, 942 N.E.2d 796 (Ind. 2011).

Midwest first asserts that there is no enforceable contract under Indiana's statute of frauds, which requires contracts for the sale of land to be "in writing and signed by the party against whom the action is brought" in order to be enforced.  Ind. Code § 32–21–1–1.  However, Midwest failed to plead the statute of frauds as an affirmative defense as Federal Rule of Civil Procedure 8(c)(1) requires.  Failure to plead an af-firmative defense normally results in forfeiture of that defense if the opposing party suffered prejudice from the delay in asserting the defense.  *See Burton v. Ghosh*, 961 F.3d 960, 965 (7th Cir. 2020).

The Court need not decide whether to excuse Midwest's oversight because it is clear without resort to the statute of frauds that no contract formed between Hennessy and Yaser and Midwest.  "Under Indiana law, an offeror is master of his offer, and as such he may prescribe the mode in which an acceptance must be made." *Rockwood Mfg. Corp. v. AMP, Inc.*, 806 F.2d 142, 145 (7th Cir. 1986) (citing *Foltz v. Evans*, 49 N.E.2d 358, 361–62 (1943)); *see also* Restatement (Second) of Contracts § 30 (1981) (offeror may prescribe particular means of acceptance).  "[A]n acceptance made otherwise will not bind the [offeror] unless the [offeror] expressly or impliedly modifies his requirements in that respect or waives them." *Foltz*, 49 N.E.2d at 361–62.  Here, the Purchase Agreement expressly states that Hennessy and Yaser's offer would expire "[u]nless accepted *in writing* by Seller and delivered to Buyer by Noon on January 7, 2018 . . . ." (ECF No. 196-1 at 8 (emphasis added).)  It is undisputed that Bleier, acting on Midwest's behalf, never accepted the offer for the Property in writing; rather, in the signed copy he transmitted, he checked the "Countered" box, not the "Accepted" box.  (*Id.*)  Hennessy and Yaser have not argued that they modified or waived their requirement that acceptance be in writing.  In fact, their summary-judgment briefing did not address the terms of the offer whatsoever.  The Court will not craft the relevant legal arguments for them.  *See Fednav Int'l Ltd. v. Cont'l Ins. Co.*, 624 F.3d 834, 842 (7th Cir. 2010).

True, substantial evidence indicates that all parties, including Bleier, seemingly believed that a contract for the transfer of the Property had been formed.  The parties executed two putative amendments to the Purchase Agreement, something people do

not normally do unless they believe a contract already exists. (*See* ECF No. 195-20; ECF No. 36-4.) Bleier asked Mandresh to persuade her clients to re-sell the house to Joe Fall, (Mandresh Dep. Tr. 66:23–67:6, ECF No. 195-18), implying that Bleier believed a contract had formed between Midwest and Hennessy and Yaser. Likewise, the listing history for the Property reflects that its status changed to "Pending" on January 6, 2018, implying it would be sold. (ECF No. 196-13 at 2.) But, simply put, none of this circumstantial evidence can overcome the plain language of the offer, which required the acceptance to be in writing before a certain time. No material facts are in dispute in this regard, and Midwest is entitled to judgment as a matter of law on Hennessy and Yaser's breach-of-contract crossclaim.

### D. Abuse of Process and Malicious Prosecution

NAC brings a claim against Hennessy and Yaser for abuse of process, and Hennessy and Yaser respond in kind with an abuse-of-process counterclaim against NAC. NAC also brings a half-hearted claim for malicious prosecution. Hennessy and Yaser seek summary judgment on all three claims.

Under Indiana law, a claimant alleging abuse of process must prove (1) an ulterior purpose or motive; and (2) "a willful use of process not proper in the regular conduct of the proceedings." *Waterfield*, 61 N.E.3d at 328. "[A] party may not be liable for abuse of process where legal process has been used to accomplish an outcome which the process was designed to accomplish." *Reichhart v. City of New Haven*, 674 N.E.2d 27, 31 (Ind. Ct. App. 1996). "Put another way, 'there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion,

26

even though with bad intentions.'" *Id.* (quoting *Groen v. Elkins*, 551 N.E.2d 876, 878–79 (Ind. Ct. App. 1990)).

### 1. NAC's Claim for Abuse of Process

According to NAC, Hennessy and Yaser's state court action was an abuse of process. But that state court action was filed against Midwest, not NAC. Arguing for summary judgment, Hennessy and Yaser dispute whether NAC can bring an abuse-of-process claim with respect to a lawsuit in which NAC is not a defendant.[4]

NAC did not respond to Hennessy and Yaser's main argument in its briefs. NAC instead focused on Hennessy's malintent toward Jim Bleier and the use of the altered Purchase Agreement in the state court complaint. (ECF No. 207 at 14–16.) By not responding to the crux of Hennessy and Yaser's argument for summary judgment, NAC forfeited its abuse-of-process claim. *See Henry v. Hulett*, 969 F.3d 769, 786 (7th Cir. 2020). If a good counterargument exists, the Court will nevertheless not write it on NAC's behalf. *See Fednav Int'l Ltd.*, 624 F.3d at 842.

Even if NAC did not forfeit its responsive arguments, Indiana caselaw seems to support Hennessy and Yaser's proposition that someone who is not directly a party to a legal proceeding cannot sue for abuse of process with respect to that legal proceeding. *Central National Bank of Greencastle v. Shoup*, 501 N.E.2d 1090 (Ind. Ct. App. 1986), is on point. There, Central National Bank initiated litigation seeking to foreclose on its mortgage on property owned by the Shoups after the Shoups sold their house to the Fishers despite a due-on-sale clause. *Id.* at 1092. The Fishers were

---

[4] Having previously taken judicial notice of the docket in the state court action, Case No. 49D05-1801-PL-003746, the Court confirms that NAC is not a party there.

joined to the lawsuit.  *Id.*  But the bank's security interest was not truly impaired, and the bank's only motive in suing was to use the threat of foreclosure as leverage to convince the Shoups to accept a higher interest rate on the mortgage loan.  *Id.* at 1095.  The court found that, but for an ambiguity in relevant state law, the bank's action for foreclosure would have constituted an abuse of process against the Shoups. *Id.* at 1096–97.  Nevertheless, even if the abuse-of-process claim succeeded as to the bank's lawsuit against the Shoups, the court said the abuse-of-process claim would not lie as to the bank's lawsuit insofar as the Fishers were involved.  *Id.* at 1097.  The court reasoned as follows:

> The Fishers were included in the action because of their potential interest in the property. There is no evidence that the bank sought or intended to obtain anything from the Fishers. The action was not aimed at extracting higher interest rates from the Fishers or pressuring the Fishers into performing any act. The bank's efforts to obtain additional interest were aimed solely at the Shoups. A wrong against one party does not automatically constitute a wrong against another. There is no evidence that Central National attempted to utilize the legal process to force the Fishers into altering their position or paying additional amounts. The bank never sought any remedy, award or compensation from the Fishers. The bank's inclusion of the Fishers in the action was proper because of their interest in the property. There was no evidence that the process was ever used by the bank to obtain anything, properly or improperly, from the Fishers. Therefore, no abuse of process occurred as between Central National and the Fishers.

*Id.*

Again, NAC was not the defendant in Hennessy and Yaser's state court action—Midwest was.  Unlike the Fishers, NAC was not even joined as a party.  Nor has NAC designated any evidence showing that Hennessy and Yaser knew NAC held title to the Property when the state court action commenced.  Indeed, the record indicates they did not know about NAC at that point.  (*See* ECF No. 207 at 2–3; ECF No. 205

at 12–14; Hennessy Dep. Tr. 42:21–43:15, ECF No. 196-16.)  If Hennessy and Yaser harbored some improper purpose in bringing the state court action, such purpose was directed toward Jim Bleier and Midwest, not NAC.  Even if the state court action implicates NAC as a subsequent purchaser of the Property, just as the bank's suit in *Central National Bank* implicated the Fishers as subsequent purchasers of the mortgaged home, NAC nevertheless has no claim for abuse of process with respect to the state court action, just as the Fishers had no such claim.  Accordingly, Hennessy and Yaser are entitled to judgment as a matter of law on NAC's claim for abuse of process.

2.  Hennessy and Yaser's Counterclaim for Abuse of Process

Hennessy and Yaser likewise bring an abuse-of-process claim against NAC.  They say that this present lawsuit constitutes an abuse of process because NAC, cooperating with Bleier, brought this litigation for the ulterior purpose of harassing and financially harming Hennessy through fraudulent damages.  Only Hennessy and Yaser moved for summary judgment here.  Nevertheless, if the Court determines that summary judgment in the opposite direction is warranted, "it may grant summary judgment in favor of the non-movant, even in the absence of a cross-motion for summary judgment, as long as the movant has been provided an adequate opportunity to present its evidence and arguments." *Little Arm Inc. v. Adams*, 13 F. Supp. 3d 914, 919–20 (S.D. Ind. 2014).  Certainly, given the extensive briefing on the pending motions, each party has had the chance to fully present their case.

29

The Court pauses to acknowledge that, in a different context, it has already grappled to some extent with the facts undergirding Hennessy and Yaser's abuse-of-process counterclaim. The Court has already satisfied itself after a hearing and response from the involved parties that NAC did not submit falsified evidence of damages. (*See* ECF No. 257 (discharging show-cause order).) The Court recognizes, however, that it assumes "the roles of complainant, prosecutor, judge, and jury" when it investigates conduct that, if true, could compromise the integrity of the judiciary. *United States v. Johnson*, 327 F.3d 554, 561 (7th Cir. 2003). To the extent that the Court weighed credibility or drew inferences for or against any party at the show-cause hearing, it would of course be inappropriate to import that sort of factfinding here for summary judgment purposes.

With that said, there are no factual disputes preventing the Court from finding that NAC is entitled to judgment as a matter of law on Hennessy and Yaser's abuse-of-process counterclaim, even in the summary judgment context. Assuming *arguendo* NAC's sole motive in bringing this lawsuit was harassing and financially injuring Hennessy, there is insufficient evidence that NAC engaged in "a willful use of process not proper in the regular conduct of the proceedings." *Waterfield*, 61 N.E.3d at 328. The only irregular conduct that Hennessy and Yaser identify that could fit the bill for this element would be submitting falsified evidence of damages in support of NAC's claims. But Hennessy and Yaser have not adduced enough evidence to prove by a preponderance that NAC submitted any falsified evidence. While they point to prior business dealings among the parties to the short sale of the Property, they have not

shown that the transactions were fraudulent under the Indiana Uniform Fraudulent Transfer Act, Ind. Code § 32-18-2-1 *et seq*. Indeed, their briefs do not invoke that Act. Circumstantial evidence of prior business relationships combined with emails evincing a joint litigation strategy, even when viewed in the light most favorable to Hennessy and Yaser, do not show that NAC orchestrated fraudulent transfers in order to submit false evidence of damages to this Court. Any inference to the contrary would be speculative at best. *See Tubergen v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 517 F.3d 470, 473 (7th Cir. 2008) (refusing to credit "inferences that are supported by only speculation or conjecture" at summary-judgment stage).

No jury could reasonably find that Hennessy and Yaser have proven the element of an improper or irregular use of process. Hence, NAC is entitled to judgment as a matter of law on Hennessy and Yaser's abuse-of-process counterclaim.

    3.  <u>NAC's Malicious Prosecution Claim</u>

A plaintiff alleging malicious prosecution must show (1) that the defendant instituted an action against the plaintiff; (2) that the defendant acted with malice; (3) that no probable cause supported the action; and (4) that the action terminated in the plaintiff's favor. *Ingram v. Diamond Equip., Inc.*, 118 N.E.3d 1, 6 (Ind. Ct. App. 2018). Not only does NAC not have standing to bring this claim, as noted above with respect to NAC's abuse of process claim, but NAC's malicious prosecution claim is forfeited because NAC failed to oppose summary judgment as to the claim. *See Henry*, 969 F.3d at 786.

### E. Slander of Title

NAC and Midwest bring a claim and crossclaim, respectively, against Hennessy and Yaser and the Tucker Defendants for slander of title. To prevail on a claim for slander of title, "a plaintiff must prove that false statements were made, with malice, and that the plaintiff sustained pecuniary loss as a necessary and proximate result of the slanderous statements." *Trotter v. Ind. Waste Sys., Inc.*, 632 N.E.2d 1159, 1162 (Ind. Ct. App. 1994) (citation omitted). NAC's and Midwest's claims fail because statements made in relation to a properly-filed lis pendens notice are absolutely privileged. *See Trotter*, 632 N.E.2d at 1164; *RCM Phoenix Partners, LLC v. 2007 E. Meadows, LP*, 118 N.E.3d 756, 762 (Ind. Ct. App. 2019). Also, as already detailed, it was the lis pendens rather than the filing of the altered Purchase Agreement that caused any pecuniary loss here. Additionally, NAC and Midwest forfeited their claims for slander of title by failing to oppose summary judgment as to these claims. *See Henry*, 969 F.3d at 786. Hennessy and Yaser and the Tucker Defendants are thus entitled to judgment as a matter of law on these claims.

### F. Tortious Interference

Midwest brought crossclaims for tortious interference with a contractual relationship against Hennessy and Yaser and the Tucker Defendants. A plaintiff alleging tortious interference must show "(1) the existence of a valid and enforceable contract; (2) the defendant's knowledge of the existence of the contract; (3) the defendant's intentional inducement of the breach of the contract; (4) the absence of justification; and (5) damages resulting from the defendant's wrongful inducement of the breach."

*Allison v. Union Hosp., Inc.*, 883 N.E.2d 113, 118 (Ind. Ct. App. 2008) (citation omitted).  This claim is a non-starter at least because the record does not suggest Hennessy and Yaser had any knowledge of the contract between Midwest and NAC when the suit for specific performance was filed.  In any event, Midwest forfeited its claims by failing to respond to the relevant parties' arguments for summary judgment as to the tortious interference crossclaim, so Hennessy and Yaser and the Tucker Defendants are entitled to judgment as a matter of law on that crossclaim.  *See Henry*, 969 F.3d at 786.

## IV.    Hennessy and Yaser's Motion for Sanctions Against NAC

Citing various instances of alleged discovery abuse by NAC and its counsel, Hennessy and Yaser move for sanctions.  (ECF No. 189.)  Their motion cites Federal Rule of Civil Procedure 37(b)(2), which permits a variety of sanctions for disobeying a discovery order, including entry of a default judgment or payment of the inconvenienced party's attorney fees.  However, by its plain language, Rule 37(b) permits these sanctions only when the offending party fails to comply with a court order.  The cases Hennessy and Yaser cite are not to the contrary.  In *Halas v. Consumer Services, Inc.*, 16 F.3d 161, 164 (7th Cir. 1994), the Seventh Circuit found that a party's failure to comply with a court order delivered orally could trigger Rule 37(b) sanctions.  The panel in Halas did not say that *no* court order was necessary.  Nor does *Dotson v. Bravo*, 202 F.R.D. 559 (N.D. Ill. 2001), *aff'd*, 321 F.3d 663 (7th Cir. 2003), say that Rule 37(b) does not require violation of a court order.  The *Dotson* court wrote, "In a discovery disclosure system, designed to operate insofar as possible without judicial

intervention, issuance of a court order in the first instance is unnecessary before a violation of the rule can be found." *Id.* at 570. But, given the cases cited in *Dotson* and that decision's later remarks on its inherent authority, the Court reads this language to refer to a district court's ability to sanction discovery misconduct through its inherent authority, not through Rule 37(b). *See Quela v. Payco-Gen. Am. Creditas, Inc.*, No. 99 C 1904, 2000 WL 656681, at *6 (N.D. Ill. May 18, 2000) ("In addition to Rule 37, a federal court has inherent powers to sanction a litigant for bad-faith conduct.").

Hennessy and Yaser have not pointed out any court order with which NAC failed to comply, so Rule 37 cannot be the source of sanctions. The question narrows, then, to whether the Court should invoke its inherent authority. "Any sanctions imposed pursuant to the court's inherent authority must be premised on a finding that the culpable party willfully abused the judicial process or otherwise conducted the litigation in bad faith." *Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 776 (7th Cir. 2016) (citations omitted). Before issuing sanctions, the Court must find by a preponderance of the evidence that willful misconduct occurred. *Ramirez*, 845 F.3d at 781.

Hennessy and Yaser first criticize the initial refusal of counsel for NAC to produce communications between him and Jim Bleier. Specifically, (1) counsel for NAC advised Bleier to refuse to respond to a subpoena duces tecum for such communications, (ECF No. 190-2), and (2) counsel for NAC refused to respond to a similar subpoena duces tecum served upon him, (ECF No. 190-3). Sanctions are not appropriate for this conduct for two reasons. First, there is a standing problem. Hennessy and Yaser

34

are challenging NAC's response to subpoenas served not by them, but by the Tucker Defendants.  Second, assuming *arguendo* Hennessy and Yaser somehow have standing, the Court ultimately ordered the communications that were the subject of these subpoenas to be produced.[5]  (*See* ECF No. 177.)  As the Court said before, NAC and Midwest's assertion of the attorney-client privilege and common-interest doctrine with respect to these communications was meritless; nevertheless, the Court declined to issue sanctions against Midwest or NAC because of Hennessy's prior "atrocious and unprofessional conduct."  (*Id.* at 20.)  A good-faith stance on privilege that is ultimately deemed meritless does not necessarily make it sanctionable.  The Court stands by its reasoning and again declines to issue sanctions with respect to NAC's refusal to respond to these subpoenas duces tecum.

Second, Hennessy and Yaser draw attention to NAC's failure to produce phone records as requested in their interrogatories.  (*See* ECF No. 190-7.)  In response to Hennessy and Yaser's request for "the cellular telephone number, billing address and cellular provider" for Karlin Fall, NAC stated that Karlin Fall was not presently using a cell phone but possessed a prepaid "Cricket" phone at the number 502-333-2065.  (*Id.* ¶ 10.)  In response to the same request as to Joe Fall, NAC provided a prepaid "Cricket" phone at the number 317-855-0075.  (*Id.*)  Hennessy and Yaser have since proffered evidence that Karlin Fall in fact had a cell phone in her possession, which

---

[5] The document requests at issue in the Court's Order on Defendants Hennessy and Yaser's Motion to Compel, (ECF No. 177), did not involve the same nominal parties as the subpoenas cited now, but the parties in interest were the same as here, and the communications sought were the same as here.  Thus, the reasoning in the Court's previous order applies with equal force.

she at least used to take photos, (ECF No. 190 at 7), and that 317-855-0075 was per-haps not Joe Fall's primary phone number, (*see* ECF No. 195-10).  NAC's responses could be described as unhelpful, but they are technically responsive, and they are not so evasive as to warrant sanctions, *cf.* Fed. R. Civ. P. 37(a)(4).

Relatedly, Hennessy and Yaser believe NAC improperly objected to the following request for production: "Produce your call and text history from January 1, 2018 through the present date." (Ex. F ¶ 12, ECF No. 190-6.)  NAC responded, "Objection, document request violates 26(b)(1)'s limitation of discovery to nonprivileged matters relevant to any party's claim or defense and proportional to the needs of the case." (*Id.*)  NAC's objection is at least colorable, and Hennessy and Yaser fail to explain why it is not.  They cite several emails between Bleier and counsel for NAC going back and forth on how NAC should respond to the request for production, but they do not explain why these emails rise to the level of willful misconduct warranting sanc-tions.

Third, Hennessy and Yaser list seven emails from Jim Bleier to counsel for NAC, which they say constitute an abuse of the discovery process.  Generally, Bleier's emails instruct counsel for NAC to cost Hennessy, Yaser, Mandresh, and F.C. Tucker "as much money as possible" by being contumacious in responding to discovery re-quests. (*See* ECF No. 190-10.)  These emails are concerning.  They indicate a desire not only to waste adverse parties' time and money, but also—by association—the Court's.  Still, Hennessy and Yaser have failed to connect each of these emails with a

specific improper action by counsel for NAC.  Absent that connection, the Court cannot say that counsel for NAC acted on Bleier's wishes by, for example, engaging in willfully dilatory conduct.  And, absent that connection, it is impossible for the Court to determine how much unnecessary time and expense Hennessy and Yaser incurred as a result of any misconduct.  Hennessy and Yaser therefore have not met their burden of proof as to these emails, and the Court will not sift through the record and craft the relevant arguments for them.

Fourth, Hennessy and Yaser point to Karlin Fall's and Joe Fall's revisions to their deposition testimony.  (*See* ECF Nos. 190-14, 190-15.)  Federal Rule of Civil Procedure 30(e) permits a deponent to review the deposition transcript and, "if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them."  The fact that the Falls consulted with counsel for NAC and made revisions afterward does not itself amount to misconduct.  By its plain language, Rule 30(e) permits a deponent to make substantive changes to his or her testimony.  *See Thorn v. Sundstrand Aerospace Corp.*, 207 F.3d 383, 389 (7th Cir. 2000) (deponent's change of deposition testimony "from what he said to what he meant" was "questionable basis for altering a deposition" but nevertheless permitted by Rule 30(e)).  However, the Court acknowledges Hennessy and Yaser's unrebutted argument that Karlin Fall's errata sheet was written and signed in the handwriting of her husband.  Even to the untrained eye, the handwriting in their errata sheets looks identical.  (*Compare* ECF No. 190-14 (Karlin Fall's errata sheet), *with* ECF No. 190-15 (Joe Fall's errata sheet).)  In an affidavit, Karlin Fall baldly declares that she "personally

filled out and signed" the errata sheet.  (Karlin Fall Aff. ¶ 5, ECF No. 199-9.)  But even the signature on Karlin Fall's affidavit is clearly not the same as that on her errata sheet.  (*Compare* ECF No. 199-9 at 3, *with* ECF No. 190-14 at 2.)  The Court finds by a preponderance of the evidence that Karlin Fall did not personally fill out and sign her errata sheet as she says she did and as Rule 30(e) requires.  *See* Fed. R. Civ. P. 30(e) (*deponent*, not anyone else, must sign a statement listing changes to deposition testimony and reasons for changes).

In fashioning an appropriate sanction for NAC's violation of Rule 30(e), the Court is mindful that any fee-shifting sanction imposed must be "limited to the fees the innocent party incurred solely because of the misconduct."  *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1184 (2017).  However, "the essential goal in shifting fees is to do rough justice, not to achieve auditing perfection."  *Id.* at 1187 (citing *Fox v. Vice*, 563 U.S. 826, 838 (2011)) (cleaned up).  Devising the right sanction is difficult because Hennessy and Yaser have not pointed out what additional fees they incurred because of Karlin Fall's improper errata sheet.  If Karlin Fall's errata sheet wasted their time and expenses, Hennessy and Yaser have failed to establish how.  The only clear cost to Hennessy and Yaser of dealing with the Rule 30(e) violation is that the violation was one of four categories of arguments for discovery sanctions Hennessy and Yaser made.  Accordingly, the Court finds that rough justice would be done if Hennessy and Yaser recovered attorney fees from NAC equal to **one-fourth the total attorney fees associated with preparing their motion for sanctions**.  The motion for sanctions, (ECF No. 189), is **granted** to this extent and otherwise **denied**.

## V.     Attorney Fees

At least some of the parties have requested awards of attorney fees under Indiana Code § 34–52–1–1, which empowers a court in any civil action to award attorney fees to the prevailing party upon a finding that a claim or defense was frivolous, unreasonable, or groundless, or if either party "litigated the action in bad faith."  However, trial courts "may, in the exercise of their discretion, refuse relief to litigants whose hands they find to be unclean." *Zeidler v. A & W Rests., Inc.*, 71 F. App'x 595, 599 (7th Cir. 2003) (citing *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 815 (1945)).  Even if there was bad faith or contumacious conduct by one or several of the parties in this case, the record reflects that no one's hands are so clean as to deserve an award of attorney fees.  The Court has previously condemned threatening communications made by Hennessy as atrocious and unprofessional.  (*See* ECF No. 177 at 20.)  For his part, Bleier has communicated with opposing counsel in an unprofessional manner, (*see, e.g.*, ECF No. 195-5), and, as discussed above, he has on multiple occasions instructed counsel for NAC to behave in a dilatory and uncooperative manner during discovery, (ECF No. 190-10).  The extent to which counsel followed these instructions is unknown, but the Court will consider these communications for the purpose of attorney fees.  In turn, Mandresh and Yaser at least acquiesced to Hennessy's stated plans to harm and punish Bleier.  Yaser was "all in" with Hennessy.  (ECF No. 204-5 at 5.)  Similarly, Mandresh told Hennessy she was "all in," (ECF No. 204-4 at 2), and said to him, "I'm there.  Whatever you need from me." (ECF No. 204-5 at 13.)  Lamentably, much of this litigation failed to present a model

39

of the civility and professionalism expected in this district.  These circumstances provide no reason to disturb the American Rule.  To the extent any party seeks attorney fees, such request is **denied**.

## VI.    Conclusion

Hennessy and Yaser's motion for summary judgment, (ECF No. 192), is **granted in part and denied in part**.  Midwest's motion for partial summary judgment, (ECF No. 204), is **granted in part and denied in part**.  NAC's motion for partial summary judgment, (ECF No. 206), is likewise **granted in part and denied in part**.  Mandresh and F.C. Tucker's motion for summary judgment, (ECF No. 214), is **granted**.  The outcome of these cross-motions is that no claims, crossclaims, or counterclaims survive for trial.  Accordingly, final judgment will issue in a separate order.

Some loose ends: As discussed above, Hennessy and Yaser's motion for sanctions, (ECF No. 189), is **granted** only to the extent that NAC must pay one-fourth the attorney fees associated with preparing the motion.  The amount of such fees should be worked out between the parties; otherwise, Hennessy and Yaser are ordered to file fee documentation within two weeks of this order's issuance.  Additionally, Midwest's motion to reconsider, (ECF No. 233), is **granted**, and Midwest's motion to designate supplemental evidence, (ECF No. 234), is **denied** as moot.  No award of attorney fees

will issue apart from what the Court has already granted with respect to Hennessy and Yaser's motion for discovery sanctions.

**SO ORDERED**.

Date: _____3/30/2021_____

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Andrew A. Ault
AULT LAW OFFICE, LLC
andrewaultlaw@gmail.com

Lisa M. Dillman
APPLEGATE & DILLMAN ELDER LAW
lisa@applegate-dillman.com

Bradley D. Hasler
DENTONS BINGHAM GREENEBAUM LLP (Indianapolis)
bradley.hasler@dentons.com

Anthony Seaton Ridolfo, Jr.
HACKMAN HULETT LLP
aridolfo@hhlaw-in.com

Sean Robert Roth
STEPHENSON RIFE LLP
seanroth@srtrial.com

M. Michael Stephenson
STEPHENSON RIFE LLP (Shelbyville)
mikestephenson@srtrial.com

Ellen Morrison Townsend
HACKMAN HULETT LLP
etownsend@hhlaw-in.com